# ARTHUR GREENSLADE[1] *vs.* MOHAWK PARK, INC.

No. 01-P-1492.

Franklin. March 18, 2003. - November 10, 2003.

Present: LAURENCE, DUFFLY, & BERRY, JJ.

*Negligence,* Duty to warn, Invited person, Open and obvious danger.

In a civil action for personal injuries and loss of consortium arising from the plaintiff's fall from a rope swing located across a river from the defendant's campground, the judge properly granted summary judgment in favor of the defendant, where the risks attendant to the rope swinging activity were open and obvious, and therefore the defendant was relieved of any duty to warn its campers or visitors to the camp of dangers associated with the rope swing, or to advise that the use of the rope swing was not a sanctioned campground activity. [852-856]

CIVIL ACTION commenced in the Superior Court Department on August 5, 1999.

The case was heard by *Lawrence B. Wernick,* J., on a motion for summary judgment.

*Christopher S. O'Connor* for the plaintiff.

*Kimberly M. McCann* for the defendant.

DUFFLY, J. After Arthur Greenslade sustained serious injuries as the result of falling from a rope swing, he commenced an action in Superior Court against Mohawk Park, Inc., the owner of a seasonal campground where Greenslade was camping when he was injured. The rope swing was attached to the limb of a tree on land owned by Joanne and Larry Lemek,[2] located on the river bank opposite Mohawk Park's property. Greenslade appeals the summary judgment in favor of Mohawk Park. We affirm.

---

[1]Individually and as father and next friend of Stephanie Nicole Greenslade, a minor, for loss of consortium.

[2]The Lemeks, who also had been named in the suit, settled with the plaintiffs and were not involved in the summary judgment proceeding.

*Background.* These undisputed facts emerge from the summary judgment materials. On land owned by Mohawk Park, which is situated between Route 2 and the banks of the Deerfield River in Charlemont, is a campground, restaurant, and bar. Although bordering the river, the campground has no beach area and no lifeguards.

Greenslade and his companion, Christina Morton, arrived at the Mohawk Park campground on August 29, 1996, the beginning of the Labor Day holiday weekend, and were assigned a campsite located just off the river bank. At that location, according to Greenslade, the Deerfield River was approximately fifty feet wide. On the river bank opposite the Mohawk Park campground was a formation of cliffs and large rocks, either close to or on land owned by Joanne and Larry Lemek. Directly across from the site where Greenslade and Morton had pitched a tent, a rope swing hung from the limb of a tree on the Lemek property. The twenty-foot rope hung about five feet inland from a rock embankment. The embankment itself rose about five feet above the Deerfield River. At the rope's end was a knot the size of a softball. Individuals using the rope swing would grab onto the knot of the rope, jump while holding on and swinging away from the bank and out over the river, then release the rope to plunge into the water below.

Neither party knows the identity of the person who constructed or hung the rope swing. There is also nothing in the record indicating that Paul Fantucchio (who, with his wife Deborah Fantucchio, owned and operated Mohawk Park) or any employees of Mohawk Park had ever witnessed visitors to the campground using the rope swing at any time prior to Greenslade's fall on August 31, 1996. However, we agree with the motion judge that prior to the date of Greenslade's accident, the facts — including the proximity of the rope swing to, and its visibility from, Mohawk Park's premises; and that on at least one occasion prior to the accident Deborah Fantucchio had warned campers who asked if they could use the rope swing that they could not and that it was dangerous — support the reasonable inference that Mohawk Park was aware of the rope swing's existence and that its guests would use it on occasion.

On August 31, Greenslade, Morton and another couple (James

and Andrea Molinari) used inner tubes to float on the Deerfield River. As they watched others across the river who were jumping from the cliffs or using the rope swing, Greenslade or James Molinari commented that "[o]ne of these guys is going to break their neck." Greenslade said: "If I see one more of those idiots hit it, I'm going to give it a shot."

After the foursome returned to the campsite, Greenslade made his way across the river to use the rope swing.[3] Greenslade climbed up an embankment onto the Lemeks' property, where he caught the rope swing. He grabbed onto the rope with both hands and, with the knot between his legs, swung out over the river, released his hold, and fell in a backwards flip headfirst into the water. Greenslade climbed back up onto the embankment and attempted a second maneuver with the rope. This time, however, the knot of the rope became entangled in his clothing, causing Greenslade to remain hanging upside down from the rope. As the rope swung back toward the bank, Greenslade fell from the rope headfirst, striking the rocky ledge on the bank below.

Greenslade was airlifted to BayState Medical Center where he remained unconscious for over a month. He sustained a spinal cord injury, leaving him without the use of his legs and with only limited use of his arms.

*Discussion.* A Superior Court judge entered a summary judgment in favor of Mohawk Park, ruling that Mohawk Park had no duty to warn its campers or visitors to the camp of the dangers associated with the rope swing, or to advise that the use

---

[3]The day before the incident, Greenslade had floated down the river in an inner tube and observed water levels in the Deerfield River rise and fall. He had at that time also observed thirty to forty people on the embankment across from his campsite jumping from the cliffs and rock embankments and using the rope swing. Greenslade apparently did not know the river's depth underneath the rope swing, nor did he know whether there were, in that specific area, objects below the water. He was, however, aware that there were rocks in the vicinity of the rope swing. We need not rely on these facts — suggesting that Greenslade may have had actual knowledge of the existence of rocks beneath the water under the rope swing — for our conclusion. "[T]he inquiry is an objective one." *Barnett* v. *Lynn*, 433 Mass. 662, 667 n.6 (2001). The "plaintiff's subjective state of mind and actual knowledge of the danger . . . [must] be excluded from an objective inquiry concerning whether the risk of injury was obvious to a hypothetical 'person of average intelligence.' " *O'Sullivan* v. *Shaw*, 431 Mass. 201, 209 (2000).

of the rope swing was not a sanctioned campground activity. Greenslade appeals that ruling, arguing that although the rope swing was not on Mohawk Park's property, it is a disputed question of fact for the jury whether the level of control exercised by Mohawk Park and its employees over the premises on which the rope swing was located nevertheless gave rise to a duty of care owed to campers, such as Greenslade, who made recreational use of the rope swing.

It is a familiar principle that a landowner has a duty to warn of any unreasonable danger of which the owner is or reasonably should have been aware. "The extension of the duty in appropriate circumstances to conditions on adjacent property derives from the same general obligation to act reasonably to protect one's invitees from the hazards of which the owner is aware." *Polak* v. *Whitney*, 21 Mass. App. Ct. 349, 352 (1985). We need not, however, address whether the plaintiffs are correct that there are material questions of fact involving the issue of control over the premises on which the swing was located, because the dispositive issue in this case is whether, as matter of law, the risks attendant to the rope swinging activity are open and obvious, precluding liability. That is to say, the outcome in this case would be the same even if it had been established that the rope swing was located on Mohawk Park's property.

"[I]t is well established in our law of negligence that a landowner's duty to protect lawful visitors against dangerous conditions on his property ordinarily does not extend to damages that would be obvious to persons of average intelligence." *O'Sullivan* v. *Shaw*, 431 Mass. 201, 204 (2000). See *Davis* v. *Westwood Group*, 420 Mass. 739, 743 n.9 (1995); *Polak, supra* at 352. This rule has continued vitality despite the Legislature's abolition of the assumption of risk defense. *O'Sullivan* v. *Shaw, supra* at 205 (summary judgment properly entered for defendant pool owner, where injury resulted from plaintiff's dive into shallow end of pool). "Landowners are relieved of the duty to warn of open and obvious dangers on their premises because it is not reasonably foreseeable that a visitor exercising (as the law presumes) reasonable care for his own safety would suffer

injury from such blatant hazards." *Id.* at 204.

The undisputed facts of this case do not overcome the rational conclusion that would be reached by a person of ordinary intelligence that it is unsafe to swing on the end of a rope suspended over water, heedless of the potential presence of rocks beneath the water's surface or of the possibility that letting go of the rope too late or too soon could result in a landing on the rocky embankment. In this respect, our decision is in accord with those of numerous other jurisdictions, described in the margin, that have concluded that diving into a river from a cliff or from a rope swing is activity undertaken in conditions that a person of average intelligence would consider to be dangerous.[4]

Similarly, we need not answer a further question raised by Greenslade, whether Mohawk Park incurred liability because it exercised a level of control over the instrumentality, the rope swing, which caused Greenslade's injury. See, e.g., *O'Brien* v. *Peterson*, 329 Mass. 427, 429-430 (1952) (defendant held liable for injury resulting from plaintiff's fall into hole, not on defendant's property, near grill, also not on defendant's property, held out as available for use and enjoyment of defendant's guests). This is an issue we think is distinct from, although related to, premises liability. There are, however, no facts

---

[4]See, e.g., *Barrett* v. *Forest Preserve Dist. of Cook County*, 228 Ill. App. 3d 975, 979-980 (1992) (dangers associated with rope swing are obvious; defendant owed no duty to protect against type of injuries sustained by plaintiff, injured when she fell from rope that hung from tree on steep incline and swung out over a ravine); *Holley* v. *International Paper Co.*, 497 So. 2d 819 (Miss. 1986) (summary judgment for defendant; no liability for plaintiff's injuries resulting from diving from rope swing into shallow water on defendant's property, to which general public was permitted); *Colip* v. *Travelers Ins. Co.*, 141 Wis. 2d 363, 366 (1987) (hazard from diving from thirteen-foot cliff into pond is open and obvious; summary judgment correct where plaintiff struck his head on "visible" and "obvious" sand bar beneath water's surface). Cf. *DeVito* v. *State*, 202 Cal. App. 3d 264, 272 (1988) (under statute precluding recovery from public entities for injuries resulting from inherently dangerous activities, State owed plaintiff no duty to warn of dangers posed by rope swinging, an inherently dangerous activity); *Bishop* v. *First Natl. Bank of Fla., Inc.*, 609 So. 2d 722, 726 (Fla. Dist. Ct. App. 1992) (plaintiff uninvited licensee was owed duty to be free from any wilful or wanton negligent act; no breach of duty, as part of danger in using rope swing is open and obvious danger of something floating beneath water's surface or possibility of hitting river bottom).

present in the record (such as where a defendant constructs a rope swing, or advertises a rope swing as an amenity available to campers and promotes its use in a manner that suggests that rope swinging is safe) that would, if proved, tend to establish any use or control of the rope swing by Mohawk Park sufficient to impose liability. Compare *Blythe* v. *Williams*, 356 So. 2d 334 (Fla. Dist. Ct. App. 1978) (plaintiff injured diving into "swimming hole" from cable swing located on campgrounds which had allegedly constructed swing; summary judgment for campground, on ground that risk was open and obvious, reversed where factual issues existed as to whether campground was negligent in providing cable swing at swimming hole extending over area of shallow water, or in failing to provide warnings as to its use); *Jackson* v. *TLC Assocs., Inc.*, 185 Ill. 2d 418, 426-427 (1998) (plaintiff injured when his head hit submerged pipe after diving from shoreline into water of manmade lake; summary judgment for defendants, on ground that diving into murky water of uncertain depth posed risk that was open and obvious, reversed where lake was designed, intended, and used solely for recreational swimming, and where injury stemmed from presence of submerged pipe placed in water by defendants, who periodically changed its location; when defendants opened lake to public and charged fee for admission, patrons had right to assume existence of appropriate safety measures). See *Bier* v. *Leanna Lakeside Property Assn.*, 305 Ill. App. 3d 45, 53, 61 (1999) (summary judgment should not have entered on claim under safety statute establishing and enforcing minimum safety standards for public bathing beaches, where plaintiffs alleged that defendants, shareholders of private lake, had erected and maintained ladder and rope swing connected to tree at its beach adjacent to lake; however, summary judgment properly entered for defendants on claim of common-law duty to warn plaintiff where risk of injury from rope swung is open and obvious).

We conclude that there was no error in applying the open and obvious danger rule to the circumstances of this case and that, under familiar principles set forth in *Community Natl. Bank* v.

*Dawes*, 369 Mass. 550, 553-554 (1976), summary judgment for the defendant was appropriately entered.[5]

*Judgment affirmed.*

---

[5]We reject the plaintiffs' claim that the defendant was an innkeeper and therefore owed to Greenslade a heightened duty of care. See G. L. c. 140, § 5, the licensing statute for innholders, which provides in pertinent part: "Every innholder shall . . . have upon his premises suitable rooms, with beds and bedding, for the lodging of his guests." At least as to campers, such as Greenslade, Mohawk Park was not an innholder as defined by the statute.